## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

ROBIN D. SHIKLES,         :
                   :
        Plaintiff      :    No. 3:14-CV-0987
                   :
    vs.             :    (Judge Nealon)
                   :
CAROLYN W. COLVIN, Acting  :
Comissioner of Social Security,  :
                   :
        Defendant   :

FILED
SCRANTON

DEC 2 2 2014

PER _____
DEPUTY CLERK

## MEMORANDUM

On May 22, 2014, Plaintiff, Robin D. Shikles, filed this instant appeal[1] under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the Social Security Administration ("SSA") denying her application for disability insurance benefits ("DIB") under Titles II and XVI, respectively, of the Social Security Act, 42 U.S.C. § 1461, et seq. (Doc. 1). The parties have fully briefed the appeal, and the matter is now ripe for review. For the reasons set forth below, the decision of the Commissioner denying Plaintiff's applications for DIB will be affirmed.

---

1. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

## BACKGROUND

Plaintiff protectively filed[2] her application for DIB[3] on February 15, 2011. (Tr. 16).[4]  These claims were initially denied by the Bureau of Disability Determination ("BDD")[5] on July 19, 2011.  (Tr. 11).  On September 9, 2011, Plaintiff filed a written request for a hearing before an administrative law judge. (Tr. 11).  A hearing was held on April 24, 2013, before administrative law judge Sharon Zanotto ("ALJ"), at which Plaintiff and vocational expert Paul Anderson ("VE") testified.  (Tr. 16).  On August 30, 2013, the ALJ issued a decision denying Plaintiff's claims because, as will be explained in more detail infra, Plaintiff's impairments did not meet or medically equal any impairment Listing, and she could perform a full range of light work with restrictions.  (Tr. 21-22).

---

2. Protective filing is a term for the first time an individual contacts the SSA to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

3. Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes.  The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured."  It is undisputed that Plaintiff met the insured status requirements of the Social Security Act through March 31, 2013.

4. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on February 28, 2014.  (Doc. 9).

5. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the SSA.

On September 16, 2013, Plaintiff filed a request for review with the Appeals Council. (Tr. 12). On March 25, 2014, the Appeals Council concluded that there was no basis upon which to grant Plaintiff's request for review. (Tr. 1-3). Thus, the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on May 22, 2014. (Doc. 1). On July 29, 2014, Defendant filed an answer and transcript from the SSA proceedings. (Docs. 5 and 6). Plaintiff filed the brief in support of her complaint on September 11, 2014. (Doc. 19). Defendant filed a brief in opposition on October 17, 2014. (Doc. 20). Plaintiff did not file a reply brief.

Plaintiff was born in the United States on March 3, 1959, and at all times relevant to this matter was considered a "an individual closely approaching advanced age."[6] (Tr. 153). Plaintiff obtained her high school diploma, and can communicate in English. (Tr. 221, 225). Her employment records indicate that she previously worked at a school in the food services department. (Tr. 263). The records of the SSA reveal that Plaintiff had earnings in the years 1975 through 1981 and 1985 through 2008. (Tr. 207). Her annual earnings range from a low of

---

6. "Person closely approaching advanced age. If you are closely approaching advanced age (age 50-54), we will consider that your age along with a severe impairment(s) and limited work experience may seriously affect your ability to adjust to other work." 20 C.F.R. 404.1563(d).

two hundred eighteen dollars and twenty-seven cents ($218.27) in 1975 to a high

of thirty-seven thousand nine hundred fifty dollars and ninety-three cents

($37,950.93) in 2006. (Tr. 207). Her total earnings during those twenty-nine (29)

years were four hundred fifty-two thousand two hundred eighty-nine dollars and

fourteen cents ($452,289.14). (Tr. 215).

Plaintiff's alleged disability onset date is August 27, 2009. (Tr. 221). The

impetus for her claimed disability as noted in her Disability Report is a

combination of the following: brittle diabetes impairment, diabetes neuropahty,

hypertension, major depressive disorder, anxiety, degenerative disc disease

("DDD"), radiculopathy, and tendonitis. (Tr. 44, 224). Plaintiff completed two

(2) Adult Function Reports on March 28, 2011 and April 9, 2011, each with an

accompanying Supplemental Function Questionnaire. (Tr. 231-253).

In the March 28, 2011 questionnaire, Plaintiff stated that her back pain

made it hard to get out of bed most mornings, and made it difficult for her to

shower and get dressed. Plaintiff stated that most days should would do nothing

because of her pain and the swelling in her legs and feet that caused difficulty

walking. (Tr. 231). She was sleepy most of the day due to pain pills that caused

an "inability to do anything." (Tr. 243). Her back pain interrupted her sleep as it

caused difficulty getting comfortable. (Tr. 232). Plaintiff's pain also caused

4

difficulty showering, getting dressed, and combing her hair, and because of this pain, Plaintiff showered about twice a week. (Tr. 232). Plaintiff indicated that she was able to cook some meals approximately twice a week with the help of her husband, but that he did most if not all of the cooking and cleaning dishes. (Tr. 233). Plaintiff indicated that her husband would wash, dry and put the laundry away, and that she would only help fold it when her husband brought it to her. (Tr. 233). She also was able to dust twice a month with breaks to sit several times before completion of the task, but her husband vacuumed. (Tr. 233). Plaintiff did not need special reminders to take care of her personal needs, but did need them to take her medicine. (Tr. 233). On the weekends, Plaintiff went to the store with her husband. (Tr. 233). She was able to go out alone, but rarely did so. (Tr. 234). She drove once or twice a month if she had to, such as when her husband was working and she had a doctor's appointment to attend. (Tr. 234). She ordered clothes online because she was unable to "stand long enough in a store to buy clothes." (Tr. 234). She was able to pay bills, count change, handle a savings account, and use a checkbook. (Tr. 234). She was unable to participate in past hobbies and interests, including needle work, sewing, and yard work, due to pain in her arms, hands, and back. (Tr. 235). She did not spend time with others aside from going grocery shopping with her husband. (Tr. 235). When asked to check

items which her "illnesses, injuries, or conditions affect," Plaintiff did <u>not</u> check

talking, hearing, seeing, memory, concentration, understanding, following

instructions, or getting along with others. (Tr. 236). Plaintiff explained that she

could not lift more than ten (10) pounds, could only walk a short distance from

one (1) room to another before needing to sit for twenty (20) minutes, could not

bend, reach, or kneel, and had difficulty going up and down the stairs. (Tr. 236).

She had no problems paying attention, and followed written and spoken

instructions well. (Tr. 236). She got along well with others. (Tr. 237). In terms

of medical devices, Plaintiff was prescribed support stockings due to swelling in

her legs and feet. (Tr. 237).

Plaintiff also filled out an accompanying Supplemental Function

Questionnaire on March 28, 2011. (Tr. 239-240). She stated that her pain began

in 2007, and was caused by her job that required her to lift up to one hundred

(100) pounds and stand for seven (7) hours a day doing repetitive tasks. (Tr. 239).

She stated that her pain was constant, was in her lower back, arms, legs, hands,

and feet, and worsened since it began. (Tr. 239). Walking, bending, standing,

sitting, and cold temperatures caused her to have pain. (Tr. 239). Plaintiff took

the prescription drug Soma, which did not relieve the pain, but did make her

drowsy. (Tr. 240). She did not attend physical therapy. (Tr. 240).

In her April 9, 2011 Adult Function Report, Plaintiff stated that she had difficulty getting out of bed because of back and leg pain, and that she spent most of her day sitting with a heating pad on her back and sleeping due to drowsiness from her pain pills. (Tr. 243). She had difficulty showering, getting dressed, and using the toilet due to pain in her back, arms, hands, legs, and feet. (Tr. 244). As opposed to her March 2011 report, Plaintiff indicated that her husband did all of the house cleaning, meal cooking, and laundry, and that he did most of the grocery shopping. (Tr. 243, 245). She stated that she only left the house to go to doctor's appointments, that she could not go out alone, and that she had not driven a car in months. (Tr. 246). It was hard for her to get comfortable in bed, which caused sleep problems. (Tr. 244). She indicated that she did not need special reminders to take care of her personal needs or to take her medicine. (Tr. 245). Plaintiff was able to pay bills, count change, handle a savings account, and use a checkbook. (Tr. 246). Her interests included watching television and playing computer games. (Tr. 247). Socially speaking, she talked to her daughter, father, and sisters on the telephone every day. (Tr. 247). She got along well with others, and was able to complete tasks and follow written and spoken instructions well. (Tr. 249). When asked to check items which her "illnesses, injuries, or conditions affect," Plaintiff did not check talking, hearing, seeing, memory, completing tasks, concentration,

understanding, following instructions, using hands, or getting along with others. (Tr. 248). She stated that the pain in her back and left leg caused an inability to bend, squat, or lift, and caused difficulty with getting up and down. (Tr. 248). She could walk two (2) to three (3) feet before needing to rest for fifteen (15) minutes. (Tr. 248). She stated that she was depressed due to the pain and not being able to work. (Tr. 250).

Plaintiff also filled out an accompanying Supplemental Function Questionnaire on April 19, 2011. (Tr. 242). She stated that her pain began in 2007 as a result of her job that required her to bend and lift up to one hundred (100) pounds. (Tr. 252). She indicated that she had pain in her lower back that would shoot down her left leg and pain in her left arm and hand, and that her feet would swell if she stood for too long. (Tr. 252). She stated that her pain was constant, was worse in the morning or after standing for too long, and had become worse since it began. (Tr. 252). She was taking Soma, that did not relieve the pain, and had never attended physical therapy. (Tr. 253).

At her April 24, 2013 hearing, Plaintiff testified that since an earlier SSA decision denying her benefits on a separate claim, her medical conditions had worsened, including her back pain that would shoot into her left leg and foot causing numbness. (Tr. 53-55). Plaintiff testified that prior to the last SSA

decision, this pain occurred a couple of times a week, but that since the decision it occurred daily. (Tr. 56). She stated that if she sat for any longer than twenty (20) minutes, her left leg and feet became numb. (Tr. 56). She had difficulty getting up from a sitting position, and could only stand for about ten (10) minutes before needing to sit back down. (Tr. 56-57). She testified that she was able to walk about one hundred (100) yards with the use of a cane. (Tr. 58). She had difficulty sleeping due to her back pain. (Tr. 60). Plaintiff indicated that she was able to fold the laundry when it was brought to her, was unable to cook, and was able to the grocery store several times with her husband where she would require a motorized scooter. (Tr. 59). She could only sit up for twenty (20) to twenty-five (25) minutes at a time due to back pain, and as a result spent most of the day laying back in a recliner. (Tr. 60-61). She testified that she was able to dress, bathe, and feed herself. (Tr. 62). Regarding medications and therapy, Plaintiff stated that since the date of the last SSA decision, Plaintiff began taking Dilaudid and Zanaflex and received injections that helped for about three (3) weeks, but that she did not attend physical therapy. (Tr. 57).

Plaintiff indicated that since the last SSA decision, she was diagnosed with arthritis in her left shoulder and neck. (Tr. 63). Plaintiff was unable to lift her left arm up or stretch it out, and that when she turned her head or arm a certain way,

9

she would feel a popping sensation. (Tr. 63-64). Plaintiff was also diagnosed with carpal tunnel syndrome that caused pain and tingling in her wrists and hands for which she received injections. (Tr. 64). It also caused Plaintiff to have difficulty grasping and holding onto objects. (Tr. 65).

With regards to her depression, she stated that her symptoms have not changed since the last SSA decision. (Tr. 62-63). However, she did testify that she was still affected by her depression as she would sometimes go three (3) days without showering, and would get into "deep funks." (Tr. 62, 69-70)

With regards to her diabetes, she testified that she no longer had problems due to a successful gastric bypass surgery. (Tr. 66). However, she had been having problems with her bowels since her surgery that had not been diagnosed at the time of the hearing. (Tr. 67). She stated that she had significant bowel pain and had to use the bathroom up to six (6) times a day. (Tr. 67). When asked what was the biggest obstacle that prevented her from working, Plaintiff stated that it was her pain and having to use the bathroom so many times. (Tr. 70).

Socially speaking, Plaintiff testified that she spoke with her dad and sisters on the telephone, but did not visit them at their houses. (Tr. 68). However, she denied having any problems getting along with people. (Tr. 69).

## MEDICAL RECORDS

On October 9, 2009, Plaintiff had an appointment with Navid Mostofi, M.D. for a follow-up of her bilateral upper extremity pain. (Tr. 407). Plaintiff noted that she continued to have pain and tingling bilaterally in her arms, and had pain in her left leg. (Tr. 407). Dr. Mostofi noted that he had advised her to increase her Lyrica dose, but that she was reluctant to because she thought the medicine had been making her gain weight. (Tr. 407). Dr. Mostofi assessed Plaintiff as having fibromyalgia, type II diabetes, depression, hypertension, and high cholesterol. (Tr. 407-408). Dr. Mostofi instructed Plaintiff to increase the Cymbalta and stop the Lyrica. (Tr. 408). He also suggested Plaintiff lose weight by watching her diet and by exercising. (Tr. 408).

On October 12, 2009, Plaintiff had an appointment with physician's assistant Kristen Hand ("P.A. Hand") for a check-up. (Tr. 338). Her problem list included insomnia, edema, hypertension, hyperlipidemia, diabetes type II, parathesia, acid reflux disease, depression, and obesity. (Tr. 338). P.A. Hand ordered a lipid panel, metabolic panel, and an electrocardiogram ("ECG"), and recommended that Plaintiff continue taking Cymbalta for depression and meet with Dr. McKenna to discuss gastric bypass surgery. (Tr. 340-341).

On November 30, 2009, Plaintiff had an appointment with Dr. Michael

Rifkin for complaints of diarrhea that had been present since 1999. (Tr. 399). Dr. Rifkin recommended that Plaintiff undergo a colonoscopy to assess the diarrhea. (Tr. 400).

On December 3, 2009, Plaintiff underwent a colonoscopy. (Tr. 388). There was no evidence of inflammatory bowel disease. (Tr. 388). Plaintiff called Dr. Rifkin to report that she had been experiencing abdominal distention, nausea, a fever, and chills. (Tr. 388). She was instructed to go to the emergency room ("ER"). (Tr. 388).

On December 4, 2009, Plaintiff went to the ER for moderate abdominal pain located mainly in her lower left quadrant. (Tr. 388). Plaintiff denied any nausea or vomiting. (Tr. 388). Plaintiff's abdominal x-rays and lab work were unremarkable. (Tr. 388). Plaintiff was admitted to the hospital, and underwent a CT scan of her abdomen, the results of which were unremarkable. (Tr. 389).

On June 14, 2010, Plaintiff had a follow-up appointment with P.A. Hand for her diabetes. (Tr. 324). Plaintiff admitted that she had not been taking her medication or checking her sugar levels. (Tr. 324). Plaintiff stated that her depression had been stable since her last visit, but noted that she still experienced fatigue, lack of energy, and sleep disturbances. (Tr. 324). She continued to have numbness in her left arm, and it was noted that an MRI of her neck revealed some

DDD. (Tr. 324). She admitted that she had been non-compliant with her hypertension and hyperlipidema medications. (Tr. 324). A review of systems was positive for depression, insomnia, muscle pain and weakness, and weakness in the extremities. (Tr. 325). It was noted that she had no edema bilaterally, had full range of motion in both shoulders, and had no pain and full range of motion in both wrists. (Tr. 325). P.A. Hand ordered blood work, and prescribed Cymbalta, Ambien, Nexium, Toprol, Triamtrene, Micardis, and Fluoxetine. (Tr. 326). Lastly, P.A. Hand noted that Plaintiff's pain seemed radicular, and that a recent MRI showed disc impingement. (Tr. 327).

On June 29, 2010, Plaintiff had an appointment with Willie M. Yu, M.D. for back pain. (Tr. 283). The treatment notes from this visit are entirely illegible. (Tr. 283).

On October 1, 2010, Plaintiff had an appointment with Dr. Yu. (Tr. 282). Plaintiff's medical history from this visit noted that she had chronic pain in her left shoulder due to arthritis and tendinitis, tingling and numbness in her left hand as a result of carpal tunnel syndrome, and lower back and tailbone pain that radiated to her lower left extremity due to DDD of the lumbar spine. (Tr. 282). Past treatment included cortisone injections into her left shoulder and hand for the carpal tunnel syndrome symptoms. (Tr. 282). It was noted that Plaintiff felt that

13

these conditions were significantly limiting her ability to function. (Tr. 282).

On November 1, 2010, Plaintiff had an appointment with Dr. Yu. (Tr. 281). Plaintiff was tested for and formally diagnosed with carpal tunnel syndrome in both her hands with no evidence of cervical radiculopathy. (Tr. 281). Dr. Yu prescribed Tramadol, ordered lumbar spine x-rays to rule out DD, stated that Plaintiff was not a candidate for carpal tunnel surgery, and recommended that Plaintiff engage her left shoulder in range of motion on a daily basis. (Tr. 281).

On November 2, 2010, Plaintiff had an x-ray of her lumbar spine. (Tr. 280). This revealed partial sacralization of the L5 vertebral body and degenerative facet arthrosis at the lumbosacral level. (Tr. 280).

On November 25, 2010, Plaintiff had an appointment with P.A. Hand for an annual exam. (Tr. 318). P.A. Hand noted that Plaintiff felt well with minor complaints. (Tr. 318). Her diabetes was relatively regulated, and she requested a letter to a law firm stating that she was unable to work for one (1) year due to her medical conditions. (Tr. 318). She stated that she had been seeing Dr. Yu for arm, back, and leg pain and numbness in her left side that was constant and unrelieved by cortisone injections. (Tr. 318). Her physical exam was positive for neck pain and menopausal symptoms, and it was noted that Plaintiff had full range of motion and no pain on movement of all joints without muscle or joint tenderness or

14

swelling. (Tr. 319-320). Plaintiff was continued on her past treatment regiment. (Tr. 321).

On December 7, 2010, Plaintiff had an appointment with P.A. Hand for follow-up paperwork in order to receive her disability payments and for complaints of stomach pain and diarrhea up to eight (8) times a day. (Tr. 314). Plaintiff reported that she had been taking her hypertension medication regularly, she had been having hypoglycemic episodes but was compliant with her diabetes medication, and she had been having abdominal pain that was improving and did not warrant an evaluation. (Tr. 314). Plaintiff's exam was negative for all findings. (Tr. 315). P.A. Hand stated that, without more information from Plaintiff's attorney, she felt uncomfortable writing a letter for her social security claim. (Tr. 316).

On January 5, 2011, Plaintiff had an appointment with Dr. Yu. (Tr. 279). Dr. Yu indicated that Plaintiff's lumbar x-ray showed moderate spurs of the L2, L3, L4, and L5 discs and minimal narrowing of the disc spaces. (Tr. 279). She had cellulitis in her lower extremities and chronic congestion of the legs, and was overweight. (Tr. 279). She was not taking the prescribed Tramadol because it caused constipation, but was taking Soma with minimal reduction of symptoms. (Tr. 279). Plaintiff appeared motivated, so Dr. Yu did not want to subject her to

heavy doses of pain medications.  (Tr. 279).

On January 7, 2011, Plaintiff had an appointment with P.A. Hand due to swelling in her legs from the knees down and into her feet she had been experiencing for two (2) weeks.  (Tr. 310).   The exam noted that Plaintiff had edema in her legs, and it was advised that Plaintiff decrease her salt intake, increase her activity level, and lose weight.  (Tr. 311).

On February 14, 2011, Plaintiff had an appointment with Steven McKenna, M.D. for a gastric bypass consultation.  (Tr. 364).  It was noted that Plaintiff did not have edema in her extremities.  (Tr. 364).

On March 7, 2011, Plaintiff had an appointment with P.A. Hand for upset stomach and diarrhea which caused her to stop taking her medication for three (3) weeks prior to her appointment.  (Tr. 304).  Plaintiff stated that she had not been exercising, but that she watched children and was "running after them" all day. (Tr. 304).  She was trying to follow a diabetic diet, had not had any hypoglycemic episodes, and wanted to switch from Metformin to Vytorin.  (Tr. 304).  She stated that she was prescribed compression stockings because her left leg would swell when she was on her feet all day.  (Tr. 304).  She admitted she had not been taking her hyperlipidema or hypertension medications.  (Tr. 304).  P.A. Hand instructed Plaintiff to continue on her diabetes medications and to restart her hyperlipidema

16

and hypertension medications. (Tr. 306).

On March 11, 2011, P.A. Hand filled out a disability form for the BDD on behalf of Plaintiff. (Tr. 352). P.A. Hand opined that Plaintiff had no difficulties in performing activities of daily living, with social functioning, or with concentration, persistence or pace. (Tr. 353-354). Plaintiff's prognosis was listed as good, as long as Plaintiff was compliant with her medications. (Tr. 354).

On June 5, 2011, Plaintiff had an appointment with medical consultant Edward Yelinek, Ph.D. ("MC"). (Tr. 426). Plaintiff drove herself to the appointment, and walked fairly easily from the waiting room to the evaluation room with no noticeable problems with either posture or gait. (Tr. 426). She stated that she had DDD, arthritis, and bone spurs in her back, and that she was in chronic pain. She stated that she sat on her recliner with a heating pad, and had difficulty exercising because it felt like someone was shocking her. (Tr. 426). The pain radiated from her back down through her left leg, and Plaintiff felt that her left hip was out of joint. (Tr. 426). She indicated that she also suffered from fibromyalgia, and had pain in both shoulders. (Tr. 426). Plaintiff noted that she tired easily, felt useless, had poor stamina, and was socially withdrawn. (Tr. 428). She stated that her husband did most of the housework, including cooking, laundry, and cleaning, and also did most of the driving. (Tr. 427). She admitted

17

that she had not consulted with a psychiatrist or physical therapist, but did see a

pain management doctor for injections. (Tr. 427). At the time of her appointment,

she was taking glyburide, Micardis, hydrochlorothiazide, Lipitor, and Actoplus.

(Tr. 427). She also indicated that she suffered from diabetes, high cholesterol, and

high blood pressure. (Tr. 427). She was taking Vicodin and Soma for the pain.

(Tr. 427). Her exam revealed normal posture and gait, mid-level mood, intact

perceptions, no evidence of suicidal or homicidal ideations, no obsessions or

compulsions, no evidence of unusual fears, clear speech, goal-oriented thought

processes, and good memory and social judgment. (Tr. 427-428). Dr. Yelinkek's

Axis I impression was adjustment disorder with a depressed mood and his Axis IV

diagnosis was medical problems. (Tr. 429). Dr. Yelinek gave Plaintiff a Global

Assessment Functioning ("GAF")[7] score of fifty-five (55). (Tr. 429). Plaintiff's

---

7. The GAF score, on a scale of 1-100, allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. American Psychiatric Association (2000). Diagnostic and Statistical Manual of Mental Disorders (4th ed., text rev.). Washington, DC: Author. A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. Id. The score is useful in planning treatment and predicting outcomes. Id. The GAF rating is the single value that best reflects the individual's overall functioning at the time of examination. The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if either the symptom severity or the social and occupational level of functioning falls within that range. When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the worse of the two.

prognosis was that her mood would improve with therapy and antidepressants.

(Tr. 429). Dr. Yelinek opined that Plaintiff's ability to understand, remember, and

carry out short, simple instructions, to understand, remember, and carry out

detailed instructions, and to make judgments on simple work-related decisions

were slightly affected by her mental health impairment. (Tr. 431). He opined that

Plaintiff's ability to interact appropriately with the public, supervisors, and co-

---

Thus, a suicidal patient who is gainfully employed would have a GAF rating
below 20. A GAF score of 21-30 represents behavior considerably influenced by
delusions or hallucinations or serious impairment in communication or judgment
or inability to function in almost all areas. Id. A GAF score of 31-40 represents
some impairment in reality testing or communication or major impairment in
several areas, such as work or school, family relations, judgment, thinking or
mood. Id. A GAF score of 41-50 indicates serious symptoms or any serious
impairment in social, occupational or school functioning. Id. A GAF score of 51
to 60 represents moderate symptoms or any moderate difficulty in social,
occupational, or school functioning. Id. A GAF score of 61-70 indicates some
mild symptoms or some difficulty in social, occupational, or school functioning.
Id.

> Recently, the American Psychiatric Association no longer uses the GAF
> score for assessment of mental disorders due to concerns about subjectivity
> in application and a lack of clarity in the symptoms to be analyzed. Solock
> v. Astrue, 2014 U.S. Dist. LEXIS 81809, *14-16 (M.D. Pa. June 17, 2014)
> (citing Ladd v. Astrue, 2014 U.S. Dist. LEXIS 67781 (E.D. Pa. May 16,
> 2014)); See Am. Psychiatric Assoc., Diagnostic and Statistic Manual of
> Mental Disorders 5d, 16 (2013). As a result, the SSA permits ALJs to use
> the GAF score as opinion evidence when analyzing disability claims
> involving mental disorders; however, a "GAF score is never dispositive of
> impairment severity," and the ALJ, therefore, should not "give controlling
> weight to a GAF from a treating source unless it is well[-]supported and not
> inconsistent with other evidence." SSA AM-13066 at 5 (July 13, 2013).

19

workers was moderately impacted, as was her ability to respond appropriately to work pressure in both a usual and routine work setting. (Tr. 431). Dr. Yelinek opined that Plaintiff could manage benefits in her own best interest. (Tr. 432).

On July 7, 2011, Plaintiff had an appointment with consultative examiner Mohammad Haq, M.D. ("CE"). (Tr. 413). Plaintiff complained that she had been having pain in her lumbosacral area that was constant. (Tr. 413). She stated that she felt best when sitting down with a heating pad and while reclining or lying down, and that her pain increased when she stood or walked. (Tr. 413). She rated her pain at a six (6) to seven (7) out of ten (10), but that it went to a nine (9) when she would stand or walk. (Tr. 413). Her pain was localized in her lumbar area and radiated to her left hip area and the left anterior thigh area. (Tr. 413). She denied experiencing any numbness in her left leg, limping, or weakness. (Tr. 413). Plaintiff stated that she did not do the grocery shopping, could only walk half (½) of a block, and does not vacuum, but she was able to cook, do the dishes, and shower and get dressed without assistance. (Tr. 414). She complained of having pain in her left arm for the prior two (2) or three (3) years that caused an inability to rotate it and difficulty with lifting it over her head. (Tr. 414). The physical exam revealed lumbar lordosis, tenderness of the lumbar and greater trochanteric area, normal station, slightly limited lumbosacral range of motion, an ability to rise

out of a chair without the support of the chair arms, and an inability to walk on her

heels and toes. (Tr. 415). The exam also revealed that Plaintiff's range of motion

at her left shoulder joint was limited causing an inability to perform complete

supination, pronation, or rotation of the left arm. (Tr. 415-416). Plaintiff was able

to squat and use the support of a chair to rise and stand. (Tr. 416). The

assessment portion of the exam noted that Plaintiff had pain in the lumbar area

with radiation into the left anterior thigh, pain in the hip area with tenderness

suggestive of torchantenic bursitis or arthritis of the left hip, bursitis of the left

shoulder with possible rotator cuff injury, obesity, diabetes, and high blood

pressure. (Tr. 416). Dr. Haq opined that Plaintiff could frequently lift and carry

two (2) to three (3) pounds and ten (10) pounds, could occasionally lift twenty

(20) pounds without using her left arm due to pain in her left shoulder, could stand

and walk for one (1) hour or less, could sit for four (4) hours, could occasionally

bend and climb, could frequently balance, and could never kneel, stoop, or crouch.

(Tr. 418-419). He also opined that Plaintiff had no limitations reaching, handling,

fingering, feeling, seeing, hearing, speaking, tasting, or smelling. (Tr. 418-419).

On July 15, 2011, Juan Mari-Mayans filled out a physical RFC form on

behalf of the BDD. (Tr. 1-2-104). Dr. Mari-Mayans stated that there was no

medical or opinion evidence available to weigh. (Tr. 102). He opined that

Plaintiff could occasionally lift or carry twenty (20) pounds, frequently lift or carry ten (10) pounds, stand and/ or walk about six (6) hours in an eight (8) hour workday, sit for about six (6) hour in an eight (8) hour workday, unlimited pushing and/ or pulling, and did not have postural, manipulative, visual, communicative, or environmental limitations. (Tr. 103). The only report Dr. Mari-Mayans reviewed in forming his opinion was that of Dr. Haq. (Tr. 103-104).

On September 23, 2011, Plaintiff underwent gastric bypass surgery that was performed by Dr. McKenna. (Tr. 554). The diagnostic impression was that Plaintiff had a segment of benign small bowel with a diverticulum, a mild to moderate microvesicular steatosis involving approximately twenty (20) to thirty (30) percent of the liver tissue, focal minimal chronic inflammation of the portal tract, focal portal tract fibrosis, and patchy pericellular fibrosis. (Tr. 559). Plaintiff was discharged on September 25, 2011. (Tr. 558).

On October 24, 2011, Plaintiff had a one (1) month post-surgical appointment with Dr. McKenna. (Tr. 531). Plaintiff reported that she had been dry heaving in the morning, and was experiencing nausea, diarrhea, and pain at the incision sites. (Tr. 531). The treatment notes from this visit are largely illegible. (Tr. 531).

On November 4, 2011, Plaintiff had an appointment with Dr. Yu. (Tr. 435).

22

It was noted that Plaintiff had gastric bypass surgery three (3) months prior to the appointment and had lost a moderate amount of weight. (Tr. 435). Plaintiff reported that she had to stopped going to the gym to exercise because of back pain that was caused by extensive degenerative changes of multiple levels of the lumbar spine. (Tr. 435). She took pain medication at night because she had been unable to find a comfortable sleeping position. (Tr. 435). At this appointment, she received a selective nerve root block and a prescription for Dilaudid with a follow-up appointment scheduled for one (1) month later. (Tr. 435).

On November 16, 2011, Plaintiff had an appointment with Dr. McKenna for a two (2) month follow-up after her gastric bypass surgery. (Tr. 530). Plaintiff reported that she had been feeling well, and that her diarrhea had stopped, but that she had been having intense lower abdominal pain about once a day. (Tr. 530). The treatment notes from this visit are largely illegible. (Tr. 530).

On February 3, 2012, Plaintiff had an appointment with Dr. McKenna for abdominal pain and heartburn. (Tr. 529). The treatment notes from this visit are largely illegible. (Tr. 529).

On February 3, 2012, Dr. Yu filled out a Lumbar Spine Impairment Questionnaire for Plaintiff. (Tr. 436). Dr. Yu listed Plaintiff's diagnoses as left shoulder tendonitis, left hip arthritis, lumbar radiculopathy, cervical disc disease, and fibromyalgia, each of which was chronic in nature. (Tr. 436). Dr. Yu

identified a limited range of motion in Plaintiff's back, swelling, abnormal gait, sensory loss, reflex changes, muscle atrophy and weakness, crepitus, and trigger points as the positive clinical findings that demonstrate his diagnosis. (Tr. 436). Dr. Yu supported his diagnosis with ct scan and lumbar x-ray results that pointed to DDD. (Tr. 437). Dr. Yu described the nature of Plaintiff's pain as degenerative, and stated that the pain was chronic in nature and was located in Plaintiff's neck, back, left shoulder, and left hip. (Tr. 438). Dr. Yu indicated that the precipitating factors that led to the pain were standing, walking, and bending, and that Plaintiff could not relieve the pain with medication without unacceptable side effects. (Tr. 438). Dr. Yu opined that, in an competitive, eight (8) hour workday, Plaintiff could sit for two (2) hours, stand or walk for one (1) hour, must get up and move around every hour for fifteen (15) minutes before sitting down again, and that it was medically recommended that Plaintiff not stand or walk continuously in a work setting. (Tr. 438-439). Dr. Yu also opined that Plaintiff could frequently lift and carry five (5) pounds, could occasionally lift and carry five (5) to ten (10) pounds, and could never lift or carry anything over ten (10) pounds. (Tr. 439). Dr. Yu opined that Plaintiff's pain was frequently severe enough to interfere with attention and concentration, and that her impairments were ongoing and created an expectation that they would last for at least twelve

24

(12) months. (Tr. 440). Dr. Yu opined that emotional factors did not contribute to the severity of Plaintiff's symptoms, that Plaintiff was not a malingerer, and that she was capable of low stress work. (Tr. 440). Dr. Yu was unsure as to whether Plaintiff's impairments were likely to produce "good days" and "bad days." (Tr. 441). Dr. Yu opined that the following limitations would affect Plaintiff's ability to work at a regular job on a sustained basis: the need to avoid heights, pushing, pulling, kneeling, bending, and stooping. (Tr. 441). Lastly, Dr. Yu stated that Plaintiff's symptoms and limitations had been occurring for many years. (Tr. 441).

On February 6, 2012, Plaintiff underwent a fluoroscopic double-contrast upper gastrointestinal series and small bowel series. (Tr. 547). This test revealed that Plaintiff had an anastomic ulceration along the superior surface of the distal portion of the gastric remnant or within the anastomis itself, and hypermobility of the small bowel. (Tr. 548).

On February 8, 2012, Plaintiff underwent an MRI of the lumbar spine without contrast ordered by Dr. Yu. (Tr. 443). This test revealed that Plaintiff had a wide central disc bulge at the L3-L4 disc level with minimal spinal canal and bilateral neural foraminal narrowing with no evidence of nerve root impingement, and mild loss of disc height at the L4-S1 level with a wide central disc bulge or

25

protrusion causing moderate bilateral neural foraminal narrowing with no evidence of nerve root impingement. (Tr. 443). The impression was that Plaintiff had mild to moderate L3-L4 and L4-S1 DDD. (Tr. 443).

On March 1, 2012, Plaintiff had an appointment with Michael Rifkin, M.D. for complaints of epigastric pain and reflux that had been occurring since her gastric bypass surgery. (Tr. 459). Plaintiff reported that she had been vomiting approximately one (1) time a day with occasional blood. (Tr. 459). Plaintiff's exam was positive for abdominal tenderness. (Tr. 460).

On March 7, 2012, Plaintiff underwent an endoscopy. (Tr. 455). This test revealed Plaintiff had an anastomatic ulcer. (Tr. 455).

On March 12, 2012, Plaintiff had an appointment with Dr. McKenna for abdominal pain and vomiting. (Tr. 527). The treatment notes from this visit are largely illegible. (Tr. 527). Plaintiff was prescribed Carafate and Aciphex. (Tr. 527).

On April 16, 2012, Plaintiff had an appointment with Dr. McKenna for complaints of ulcer symptoms including abdominal pain, distention, and vomiting. (Tr. 523). Dr. McKenna diagnosed Plaintiff with reflux and chronic ulcer disease, and prescribed Aciphex and Carafate for Plaintiff. (Tr. 524).

On April 19, 2012, Plaintiff had an appointment with Dr. Rifkin for

26

persistent abdominal pain and bloating that occurred instantly after eating. (Tr. 452). Plaintiff also reported that she had been vomiting several times a week. (Tr. 452). Plaintiff's exam revealed abdominal tenderness and slightly hyperactive bowel sounds. (Tr. 452).

On April 23, 2012, Plaintiff underwent an upper gastrointestinal and small bowel CT scan ordered by Dr. Rifkin. (Tr. 475). This test revealed a shallow defect along the dorsal aspect of the anastomatic, suggesting Plaintiff had an ulcer. (Tr. 475). There was no evidence of obstruction. (Tr. 475).

On May 2, 2012, Plaintiff had a repeat endoscopy ordered by Dr. Rifkin. (Tr. 448-449). This test revealed a mostly resolved ulcer. (Tr. 449). Dr. Rifkin indicated that it was not clear as to why Plaintiff was having symptoms of pain and obstruction. (Tr. 448).

On May 9, 2012, Plaintiff underwent a CT scan of the abdomen. (Tr. 473-474). This test revealed inflammatory changes and terminal ileitis that was most likely caused by Crohn's disease. (Tr. 473-474).

On May 18, 2012, Plaintiff underwent a colonoscopy performed by Dr. Rifkin due the CT scan results that suggested Plaintiff had Crohn's disease. (Tr. 444). Dr. Rifkin was unable to intubate and visualize the ilieum, but what he could see, which was minimal, pointed to normal results. (Tr. 444). Dr. Rifkin

27

consulted with Dr. Ghazi from University of Maryland, who agreed to repeat the colonoscopy. (Tr. 444).

On June 15, 2012, Plaintiff underwent an abdominal MRI. (Tr. 499-502). This test revealed findings that were suggestive of Crohn's disease. (Tr. 499). However, there was no other colonic or small bowel finding suggestive of inflammatory bowel disease. (Tr. 499). There were findings at the distal gastric bypass anastomosis suggestive of possible adhesions in this region without obstruction. (Tr. 499).

On June 25, 2012, Plaintiff underwent another colonoscopy at the University of Maryland for complaints of abdominal pain and diarrhea and due to abnormal MRI and CT scans of the gastrointestinal tract. (Tr. 481). The impression was that Plaintiff's ileum was normal with no evidence of Crohn's disease, but the conglomeration of bowel loops at the distal anastomosis may explain obstructive symptoms secondary to adhesive disease. (Tr. 482).

On October 29, 2012, Plaintiff had an appointment with Dr. McKenna because she continued to have pain after eating almost one (1) year post gastric bypass surgery. (Tr. 519). Plaintiff's exam was positive for abdominal tenderness. (Tr. 520). Dr. McKenna prescribed Protonix and Carafate for Plaintiff. (Tr. 520).

28

On December 5, 2012, Plaintiff underwent an EMG ordered by Dr. Yu. (Tr. 511). This test revealed that Plaintiff had moderate carpel tunnel syndrome of her right hand, mild carpel tunnel syndrome in her left hand, and a mild cervical radiculopathy bilaterally. (Tr. 511). Dr. Yu recommended that Plaintiff continue taking Dilaudid, use a splint for her wrists, and perform stretching exercises. (Tr. 511).

On December 10, 2012, Plaintiff had a follow-up appointment with Dr. McKenna. (Tr. 515). Plaintiff told Dr. McKenna that she had been noncompliant with the Carafate because she felt it caused extreme constipation. (Tr. 515). Plaintiff stated that she continued to have pain after eating, and was suffering from constipation and diarrhea. (Tr. 515). Dr. McKenna recommended that Plaintiff undergo a diagnostic laparoscopy. (Tr. 516).

On January 4, 2013, Plaintiff had an appointment with Dr. Yu for numbness and tingling in both hands and pain in both shoulders with limited motion. (Tr. 560). Dr. Yu found that Plaintiff had anterior shoulder tenderness and a positive rotator cuff impingement. (Tr. 560). Plaintiff was given a steroid injection, and was instructed to continue taking Dilaudid. (Tr. 560).

On January 8, 2013, Plaintiff underwent a laparoscopy which revealed adhesions that were subsequently removed. (Tr. 562). Plaintiff continued to have

pain. (Tr. 562). As a result, on January 13, 2013, Plaintiff underwent another laparoscopy with an anterior enterostomy. (Tr. 563-565). The results of the this test were normal, and Plaintiff was discharged on January 16, 2013 with prescriptions for Protonix, Phenergan, and Dilaudid. (Tr. 563-565).

On April 5, 2013, Dr. Yu issued a report, in which he opined that Plaintiff had limited functioning due to the following: irritable bowel syndrome, obesity post-bypass surgery, chronic lumbosacral pain that radiated into her lower extremities and was caused by DDD and lumbar radiculopathy, neck pain from DDD, bilateral shoulder, hip, and knee pain from arthritis, and wrist pain due to carpel tunnel syndrome with poor dexterity. (Tr. 560-561).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).

Factual findings which are supported by substantial evidence must be upheld. 42

U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where

the ALJ's findings of fact are supported by substantial evidence, we are bound by

those findings, even if we would have decided the factual inquiry differently.");

Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the

Secretary must be accepted as conclusive by a reviewing court if supported by

substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe

v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520,

1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of

evidence, but 'rather such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565

(1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938));

Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008);

Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has

been described as more than a mere scintilla of evidence but less than a

preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual

record, substantial evidence may be "something less than the weight of the

evidence, and the possibility of drawing two inconsistent conclusions from the

31

evidence does not prevent an administrative agency's finding from being supported by substantial evidence." <u>Consolo v. Federal Maritime Commission</u>, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," <u>Cotter</u>, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. <u>Mason</u>, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d at 706-07. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12

32

months." 42 U.S.C. § 432(d)(1)(A).  Further,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and claims for disability insurance benefits.  See 20 C.F.R. § 404.1520; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work, and (5) if not, whether he or she can perform other work in the national economy.  Id.  As part of step four, the Commissioner must determine the claimant's residual functional capacity.  Id.  If the claimant has the

residual functional capacity to do his or her past relevant work, the claimant is not disabled. Id. "The claimant bears the ultimate burden of establishing steps one through four." Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004). "At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity. " Id.

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

## ALJ DECISION

Initially, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through March 31, 2013. (Tr. 18). At step one, the ALJ

found that Plaintiff had not engaged in substantial gainful work activity from her onset date of August 27, 2009.  (Tr. 18).

At step two, the ALJ determined that Plaintiff suffered from the severe combination of impairments of the following: "degenerative disc disease of the lumbar spine, carpal tunnel syndrome, and obesity status post bypass (20 C.F.R. 404.1520(c))."  (Tr. 18).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).  (Tr. 21).

At step four, the ALJ determined that Plaintiff had RFC to perform light work as defined in 20 CFR § 404.1567(b),

> [E]xcept that she requires alternating positions at will. [Plaintiff] can occasionally reach overhead with her left upper extremity, can frequently finger and feel, occasionally kneel, stoop/ bend, crouch/ squat, balance, climb ramps and stairs and needs to avoid climbing ladders, ropes and scaffolds.  In addition, due to [Plaintiff's] medication side effects, she needs to avoid exposure to moving mechanical parts, unprotected heights, can understand, remember and carry out simple instructions such as those requiring a GED of 1, 2 and 3, can perform occasional decision making and judgment, and can occasionally respond to work setting changes.

(Tr. 22).  In consideration of Plaintiff's RFC, the ALJ determined Plaintiff was

unable to perform any past relevant work.  (Tr. 26).

At step five, the ALJ found that given Plaintiff's age, education, work experience, and RFC, there were jobs that existed "in significant numbers in the national economy that Plaintiff could perform (20 C.F.R. 404.1569, 404.1569(a), 416.969, and 416.969(a))."  (Tr. 26-27).

The ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act at any time between the alleged onset date of August 27, 2009 through March 31, 2013, the date of last insured.  (Tr. 27).

## DISCUSSION

On appeal, Plaintiff challenges the ALJ's decision on the grounds that the ALJ failed to: (1) properly weigh the medical evidence; (2) properly evaluate Plaintiff's credibility; and (3) adequately consider Plaintiff's obesity and related post-bariatric surgery gastrointestinal problems.  (Doc. 9, p. 14).

Plaintiff asserts that the ALJ erred in giving little weight to the opinions of treating physician Dr. Yu and examining physician Dr. Haq in violation of the treating physician rule and 20 C.F.R. § 404.1527(c)(1) because theses opinions were supported by and consistent with the record.  (Doc. 9, pp. 14-21).  Plaintiff contends that the reasons provided by the ALJ for discrediting the opinion of Dr.

Yu were inadequate because while the ALJ found Dr. Yu's opinion was

inconsistent with the course of treatment and that Plaintiff's pain improved with

medication, the ALJ did not determine that Dr. Yu's opinion was unsupported by

medical evidence and did not identify other substantial evidence contradicting his

opinion. (Id. at 15-16). Plaintiff contends that the ALJ's reason for discrediting

Dr. Haq's opinion, which was that his opinion was inconsistent with the

"conservative" treatment Plaintiff received and was based on Plaintiff's subjective

complaints, is also inadequate because Dr. Haq performed a direct examination of

Plaintiff. (Id. at 20-21). She also argues that the ALJ erred in giving significant

weight to the opinion of medical consultant Dr. Mari-Mayans because he did not

directly examine Plaintiff and relied on an incomplete medical record in forming

his opinion. (Id.). Furthermore, Plaintiff asserts that even if there had been

enough evidence to not give Dr. Yu's opinion controlling weight, the ALJ violated

SSR-96-2p because she failed to give deference to Dr. Yu's opinion using all of

the factors provided in 20 C.F.R. §§ 404.1527 and 416.927. (Doc. 9, p. 20).

The preference for the treating physician's opinion has been recognized by

the Third Circuit Court of Appeals and by all of the federal circuits. See, e.g.,

Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000). This is especially true

when the treating physician's opinion "reflects expert judgment based on a

continuing observation of the patient's condition over a prolonged time."

Morales, 225 F.3d at 317; Plummer, 186 F.3d at 429; see also 20 CFR §

416.927(d)(2)(i)(1999) ("Generally, the longer a treating source has treated you

and the more times you have been seen by a treating source, the more weight we

will give to the source's medical opinion."). When the treating physician's

opinion conflicts with a non-treating, non-examining physician's opinion, the ALJ

may choose whom to credit in his or her analysis, but "cannot reject evidence for

no reason or for the wrong reason." Morales, 225 F.3d 316-18. It is within the

ALJ's authority to determine which medical opinions he rejects and accepts, and

the weight to be given to each opinion. 20 C.F.R. § 416.927. Regardless, the ALJ

has the duty to adequately explain the evidence that he rejects or to which he

affords lesser weight. Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 505-06 (3d Cir.

2009) (holding that because the ALJ did not provide an adequate explanation for

the weight he gave to several medical opinions, remand was warranted). "The

ALJ's explanation must be sufficient enough to permit the court to conduct a

meaningful review." In re Moore v. Comm'r of Soc. Sec., 2012 U.S. Dist. LEXIS

100625, *5-8 (D.N.J. July 19, 2012) (citing Burnett v. Comm'r of Soc. Sec., 220

F.3d 112, 119-20 (3d Cir. 2000)). Therefore, the ALJ has a duty to discuss all

opinion evidence, and to provide an adequate explanation for rejecting an opinion

of a treating physician.

Upon review of the record, it is determined that the ALJ's explanations for discrediting the opinions of treating physician Dr. Yu and examining physician Dr. Haq are inadequate.  The ALJ afforded significant weight to the opinion of the "state agency medical consultant," namely Dr. Mari-Mayans, that Plaintiff could perform light work because:

> [I]t was supported by the medical and objective findings at that time.  Nonetheless, the undersigned has provided [Plaintiff] with a more restrictive functional capacity, including a sit/stand option and postural restrictions based on the totality of the evidence and in an effort to give [Plaintiff] some benefit of the doubt concerning her allegations to the extent that they are supported by the treatment history and her presentation on examinations.

(Tr. __).  The ALJ gave Dr. Yu's opinion little weight because: (1) his opinion that Plaintiff was disabled for a period of twelve (12) months or more was not supported by an assessment of specific functional limitations; (2) Plaintiff was noncompliant with exercise and weight loss recommendations; (3) Dr. Yu treated Plaintiff conservatively without referral to an orthopedic evaluation or consultation; (4) Dr. Yu's assessment regarding Plaintiff's functional limitations was not consistent with his conservative treatment approach, which consisted of injections and medicine that helped Plaintiff's pain levels; (5) examination

39

findings failed to support a degree of symptomology consistent with the inability

to perform sitting, standing, or walking for less than three (3) hours a day; and (6)

treatment with Dr. Yu was sporadic. (Tr. 25-26). The ALJ also gave little weight

to Dr. Haq's opinion, stating the following:

> Dr. Haq assessed [Plaintiff] capable of lifting 20 pounds
> occasionally and carrying 10 pounds, but capable of standing
> only one hour and sitting 4 hours with a need to avoid
> kneeling, stooping and crouching (Exhibit 6F). However, the
> undersigned finds that there is insufficient evidence to support
> these limitations as [Plaintiff] has required conservative
> treatment measures, and does not exhibit correlating
> examination findings. There is also no indication that
> [Plaintiff] has reported back pain since November 2011. It
> appears that Dr. Haq based his limitations on [Plaintiff's]
> allegations rather than the medical and objective findings. For
> these reasons, little weight is given to this assessment.

(Tr. 25). However, none of these explanations state that the opinions of Dr. Yu

and Dr. Haq were inconsistent with or not well-supported by the record. In fact,

these explanations suggest that the ALJ was substituting her own medical opinion

for that of Plaintiff's physicians. The ALJ's disagreement with these physicians'

treatment course and opinions as to Plaintiff's functional limitations revolves

around what the ALJ thinks these physicians should have or would have done had

Plaintiff truly had the limitations these physicians opined she had. It is well-

established that an ALJ is not permitted to "play doctor" or substitute her own

medical opinion for that of Plaintiff's physicians. "Judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor" because "lay intuitions about medical phenomena are often wrong." Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir 1990). Therefore, it is outside of the ALJ's discretion to decide whether Plaintiff's symptoms and treatment for her impairments support with functional limitations as opined by her physicians.

Furthermore, it is determined that the ALJ improperly afforded weight to Dr. Mayan's opinion in reaching her RFC determination because the state agency examination record indicates that the whole medical record was not available for review by Dr. Mari-Mayans. (Tr. 102-104). Initially, Dr. Mari-Mayans stated, "[t]here is no indication that there is medical or other opinion evidence." (Tr. 102). He then proceeded to review only one (1) medical record provided by Dr. Haq. (Tr. 103-104). Consequently, Dr. Mayan's medical opinion was not well-supported by the entire evidence of record because he did not review the remainder of the objective medical evidence, including that provided by Dr. Yu, P.A. Hand, Dr. Rifkin, Dr. McKenna, and Dr. Mostofi.

Therefore, substantial evidence does not support the ALJ's RFC finding. As such, the remaining issues raised in Plaintiff's complaint will not be addressed

as remand is warranted.

## **CONCLUSION**

Based upon a thorough review of the evidence of record, the Court finds that the Commissioner's decision is not supported by substantial evidence. Therefore, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner will be vacated,  and the appeal will be granted.

A separate Order will be issued.

**Date**: December 18, 2014

United States District Judge

42